UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LINDA O'SULLIVAN fka LINDA BOESE,<br><br>Plaintiff,<br><br>-against-<br><br>RAMAPO PRACTICE MANAGEMENT, LLC,<br><br>Defendant. | Case No.<br><br>**07 CIV. 3456**<br>**WP4**<br><br>COMPLAINT<br><br>**PLAINTIFF DEMANDS TRIAL BY JURY** |

Plaintiff Linda O'Sullivan fka Linda Boese, as and for her Complaint, states as follows:

### The Parties

1. Plaintiff Linda O'Sullivan fka Linda Boese resides at 31 Emma Lane, Harriman, New York 10926, in the County of Orange.

2. Upon information and belief, defendant Ramapo Practice Management, LLC ("defendant RPM") is a New York limited liability company with various office addresses, including an office at 505 Route 208, Monroe, New York 10950 in Orange County, New York and other offices in Rockland County, New York.

3. Upon information and belief, defendant RPM is in the business of providing radiological services.

### Jurisdiction and Venue

4. This Court has jurisdiction of this complaint which seeks compensation for discrimination under the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12101 et seq.*, and for violations of the Family Medical Leave Act, *28 U.S.C. § 2601* et seq. (the "FMLA").

5. This Complaint is timely brought within 90 days of the issuance of a Right to Sue Letter by the Equal Employment Opportunity Commission, which letter was issued on February 6, 2007.

6. Upon information and belief, defendant RPM is an employer that is subject to the ADA as it has 15 or more employees, including, professional, part-time and hourly workers.

7. Upon information and belief, defendant RPM is an employer that is subject to the FMLA as it has 50 or more employees, working in offices within a 75-mile radius of the office where plaintiff was employed.

8. Plaintiff is an employee eligible for protection under the FMLA because in the year prior to her wrongful termination plaintiff worked more than 1,250 hours for defendant RPM.

9. This action is timely brought under the FMLA within 3 years of the last act done in violation of the FMLA by defendant RPM.

## Preliminary Statement

10. Plaintiff was wrongfully discharged from her employment in February 2005 after she requested accommodation for her disability in or about May 2004.

11. Plaintiff suffers from a condition called chostrocondritis which qualifies as a disability under the ADA.

12. Chostrocondritis is an impairment that substantially limits one or more of the plaintiff's major life activities.

13. Throughout 2004, plaintiff was seeing a cardiologist for this condition and had a record of this impairment.

14. Defendant perceived and regarded plaintiff as having a disability that qualifies as such under the ADA.

15. Plaintiff requested a reasonable accommodation for her disability to be made by defendant RPM.

16. With or without such reasonable accommodation, plaintiff was qualified and able to perform the essential functions of her job.

17. Defendant RPM admitted that it could reasonably make such accommodation for plaintiff's disability by agreeing to make such accommodation.

18. However, shortly after plaintiff advised defendant RPM's practice administrator, Pam Cariello ("Cariello"), of her disability in May 2004 and of her need for accommodation, Cariello began criticizing plaintiff for the first time.

19. As of May of 2004, plaintiff had worked for defendant RPM for more than four years without any formal criticism from defendant RPM. During this time, plaintiff was praised for her work and given annual merit bonuses.

20. Ultimately, plaintiff was terminated on February 2, 2005 because of defendant RPM's discriminatory view of plaintiff's disability and her request for reasonable accommodation, upon the pretense that plaintiff had a defensive attitude (when unfairly criticized) and was insubordinate (after being given conflicting instructions as to her job duties).

21. Throughout her employment with defendant RPM, plaintiff never saw a posting regarding employees' rights under the FMLA and she was not otherwise advised by her employer of her rights under this law, except for a mention in passing in December 2004 or January 2005.

## The Facts

22. From January 2000 through February 2, 2005, plaintiff was employed as defendant's Marketing and Advertising Manager.

23. For almost five years, until May 2004, plaintiff received only high praise for her work.

24. Until her discharge in February 2005, plaintiff was awarded annual merit raises and annual merit bonuses.

25. By letter dated May 14, 2004 and also verbally in May 2004, plaintiff first advised her supervisor, Cariello, that plaintiff was suffering from a medical condition which had caused plaintiff's doctor to recommend that she take a temporary leave of absence and/or that she temporarily reduce her work hours by 20%.

26. Cariello advised plaintiff at that time that defendant RPM could reasonably grant, reasonable accommodation for this disability and offered to make such accommodation by permitting plaintiff to work four days per week instead of five.

27. Defendant RPM has admitted in pleadings submitted to the New York State Division of Human Rights ("DHR") in connection with a review of plaintiff's state law claims for discrimination that plaintiff "satisfactorily performed her work until the late spring/early summer of 2004."

28. Defendant RPM further admitted in pleadings before the DHR that it was only beginning in the late spring or early summer of 2004 that defendant RPM first began to complain to plaintiff of plaintiff's alleged poor performance.

29. Upon information and belief, defendant RPM's manager and principals resented

having to make accommodation for plaintiff's disability and therefore began discriminating against her by criticizing her unreasonably and by giving her contradictory directions which she was unable to follow.

30. Plaintiff requested that defendant RPM accommodate her medical needs by temporarily reducing her workload and by rearranging her job duties to temporarily include more in-office time and less time out "on the road" traveling to meet referring and potentially referring doctors.

31. Initially, in response to this request, defendant RPM"s practice administrator, Cariello, told plaintiff that she would accommodate plaintiff's medical needs by allowing her to work a four-day week.

32. Cariello, however, advised plaintiff that she would not be telling the principals of RPM of her plan to accommodate plaintiff's medical disability and she instructed plaintiff to keep the matter a secret and to not tell anyone in the office about their arrangement.

33. Upon information and belief, the reason for this secrecy was that the principals of defendant RPM would not have agreed to accommodate plaintiff's medical disability, even though Cariello understood that such accommodation could reasonably be made without detriment to the practice.

34. Cariello did not request in May 2004 that plaintiff provide defendant RPM with a note from her doctor. Rather, Cariello encouraged plaintiff to keep the matter a secret and to not let anyone in the office know that she was suffering from a medical condition that was causing her to be disabled.

35. Thereafter, despite having ostensibly agreed to make accommodation of plaintiff's

medical condition by allowing plaintiff to work one day from home, Cariello for the first time began to criticize plaintiff's work as being inadequate.

36. In effect and in fact, defendant RPM made no accommodation for plaintiff's disability and instead began treating plaintiff with hostility and undue criticism.

37. After plaintiff made her request for accommodation, Cariello became increasingly hostile towards plaintiff. Indeed, defendant RPM has admitted that Cariello became hostile towards plaintiff only after the request for accommodation was made.

38. Despite defendant RPM's admission that it understood that plaintiff had a disability, Cariello testified at the DHR informal investigative hearing that she personally believed plaintiff's disability stemmed from the fact that plaintiff was having personal problems.

39. Upon information and belief, Cariello held a grudge against plaintiff for requesting accommodation for her disability because she personally believed that people generally should overcome their disabilities and not ask for special consideration regardless of a disability.

40. Upon information and belief, the principals of RPM discovered in August 2004 that Cariello had agreed ostensibly to accommodate plaintiff's disability by reducing her days in the office to four.

41. Upon information and belief, the principals of RPM, specifically, Dr. Harvey Peck, thereafter began criticizing plaintiff for the first time and encouraging Cariello to engage in a pattern of harassment and undue criticism of plaintiff.

42. Cariello's behavior escalated in August 2004; at that time, Cariello advised plaintiff that plaintiff would have to begin punching a time clock and she told plaintiff that the

principals of RPM had suddenly decided that plaintiff was no longer the type of person that they wanted to represent the business.

43. At this point in time, the fundamental terms of plaintiff's employment had changed because plaintiff had requested that her employer make a reasonable accommodation of her disability.

44. Up to that time, plaintiff had been a salaried employee who had received excellent reviews, merit increases and merit bonuses.

45. In addition to being criticized, plaintiff began being subjected to other forms of hostile and abusive treatment from Cariello. For example, plaintiff began for the first time to receive inconsistent and contradictory instructions from Cariello as to plaintiff's job duties, and she then began for the first time to receive criticism from Cariello for being "insubordinate" when plaintiff followed one set of instructions in lieu of another and "defensive" when plaintiff pointed out to Cariello that she was receiving contradictory instructions.

46. Upon information and belief, and based upon Cariello's own testimony at the investigatory conference, the reason that Cariello was treating plaintiff in this manner was that Cariello did not believe that plaintiff should be given reasonable accommodation for her disability.

47. Cariello's abusive treatment and undue criticism started only _after_ plaintiff advised Cariello in May 2004 of her need for medical accommodation and increased only after the principals of RPM became aware in August 2004 that some accommodation may have been made for her. Before this time, plaintiff was admittedly a model employee who had an excellent employment record with defendant RPM.

48. In the fall of 2004, Cariello asked plaintiff for the first time for a note from her cardiologist to support her claim of disability and the need for a reasonable accommodation.

49. Upon information and belief, by encouraging plaintiff to keep her disability and the "accommodation" a secret, Cariello tried to set the plaintiff up by creating a scenario where a "record" of issues with plaintiff's employment predated the presentation of a doctor's note supporting the disability and the request for reasonable accommodation.

50. In or about December 2004, Cariello advised plaintiff that she would no longer make any accommodation for her disability.

51. In or about December 2004 or January 2005, Cariello discussed with plaintiff for the first time plaintiff's right to take a leave of absence under the FMLA.

52. Upon information and belief, defendant RPM had not posted signs in the office informing employees of their rights under the FMLA.

53. While she mentioned the possibility of such a leave in passing, Cariello never advised plaintiff that she had a right to continued health coverage at the employer's expense during such a leave of absence.

54. In January 2005, plaintiff was advised that she would be getting a formal annual review for the first time plaintiff since she had begun working there in January 2000.

55. In January 2005, plaintiff was also given a written job description for the first time which job description conflicted with what she had previously been told were her job duties.

56. At the same time she was given this new job description, plaintiff was given an Employee Warning Notice for insubordination for not following the job duties described. This was the first such written notice plaintiff had received.

57.     On February 2, 2005, plaintiff provided Cariello with the note from her cardiologist stating that she should be able to return to work full-time as of April 1, 2005.

58.     Later that day on February 2, 2005, Cariello called a meeting with plaintiff wherein she terminated plaintiff's employment citing as reasons "insubordination" and "defensive attitude" on plaintiff's part.

59.     These stated reasons for plaintiff's discharge were a mere pretense for discharging plaintiff. The true reason plaintiff was discharged was because she had asked for a reasonable accommodation of her medical disability which defendant RPM's manager did not want to give to plaintiff because of her own prejudices against anyone who thought accommodation should be made for them.

60.     In addition, upon information and belief, defendant RPM's owners also did not want to make reasonable accommodation for plaintiff's disability. This is the reason that Cariello insisted on keeping secret the purported accommodation of a four-day work week and this is the reason that Dr. Harvey Peck and other principals suddenly became critical of plaintiff in August 2004 after she had given four and a half years of excellent service.

61.     Defendant RPM has admitted that it could have given plaintiff a reasonable accommodation of her medical disability without detriment to its practice. Defendant RPM in fact gave the accommodation but then engaged in a pattern of abusive conduct and criticism in order to create a pretense for terminating plaintiff so as to avoid continuing the accommodation and to punish plaintiff for having requested an accommodation.

62.     In so doing, defendant RPM caused plaintiff enormous stress and mental anguish by subjecting her to a hostile work environment and by ultimately discharging plaintiff on a

pretextual basis.

63.     After four and one-half years of an excellent employment record, plaintiff only became a "problem" employee when she asked for an accommodation of her medical disability.

64.     Cariello's abuse and mistreatment of plaintiff was substantial and created a hostile work environment which exacerbated plaintiff's medical condition and caused her to suffer substantial increased stress and anxiety during these final months of her employment.

65.     Despite Cariello's abusive conduct between the summer of 2004 and plaintiff's termination in February 2005, plaintiff was given a raise at the end of 2004 and a $3,000 merit bonus, indicating that plaintiff was performing her job duties at an acceptable level.

66.     Since plaintiff's wrongful termination on February 2, 2005, plaintiff has searched and applied for, but has been unable to obtain in her geographic area, employment of a similar quality at similar pay.

67.     As a result, plaintiff has been forced to accept work in a retail establishment at substantially lesser pay and substantially lesser benefits than what she previously was earning in her 5 years with RPM.

## Count I

**(Discrimination under the ADA, *42 U.S.C. § 12101 et seq.*;
Conditions of Employment)**

68.     Plaintiff repeats the allegations set forth above in paragraphs 1 through 67 as if fully restated here.

69.     As set forth above, by reason of her disability, plaintiff was wrongfully discriminated against in her employment in that the terms and conditions of her employment changed once her disability was disclosed and request for reasonable accommodation made.

70. Defendant RPM, by its officer manager, Cariello did wrongfully discriminate against plaintiff by creating a hostile work environment for the first time after learning of her disability and of her request for reasonable accommodation and in reaction to the disability and the request for accommodation, including but not limited to leveling at plaintiff undue criticism of her personality and interaction with others, by providing plaintiff with conflicting instructions as to her job duties and then unduly criticizing her for "insubordination" and "defensive attitude" when she was reasonably unable to follow all of the conflicting instructions, and by demanding that she punch a time clock when she had previously been paid as a professional on a weekly basis.

71. As a result of this hostile discriminatory treatment, plaintiff suffered severe emotional distress and anxiety.

### Count II

**(Discrimination under the ADA, *42 U.S.C. § 12101 et seq.*;
Wrongful Discharge from Employment)**

72. Plaintiff repeats the allegations set forth above in paragraphs 1 through 71 as if fully restated here.

73. As set forth above, by reason of her disability, plaintiff was wrongfully discharged from her employment on the pretense that her personality and job performance had suddenly changed after more than four years of exemplary service when in reality defendant RPM, by its officer manager, Cariello did wrongfully discriminate against plaintiff after learning of her disability and of her request for reasonable accommodation and in reaction to the disability and the request for accommodation.

74. As a result of this discriminatory termination, plaintiff suffered severe emotional

distress and anxiety, lost wages past and future, and has incurred attorneys' fees, and costs.

## Count III

### (Violations under the FMLA, *29 U.S.C. § 2601 et seq.*; Wrongful Discharge from Employment)

75. Plaintiff repeats the allegations set forth above in paragraphs 1 through 74 as if fully restated here.

76. As set forth above, defendant RPM interfered with plaintiff's right to take a leave of absence under the FMLA by failing to provide her with timely notice of her right to do so, including by failing to post a notice of such rights in a conspicuous location, and by failing to advise plaintiff that they would, and were required by law, to continue her medical benefits during such leave of absence and by allowing plaintiff to proceed under the misconception that she needed to continue working in order to continue receiving medical benefits.

77. As a consequence of defendant RPM's violation of the FMLA and plaintiff's rights thereunder, plaintiff suffered severe emotional distress and anxiety, damages in the form of the continuing cost of her medical benefits after her discharge, lost wages past and future, and she has incurred attorneys' fees, and costs.

WHEREFORE, plaintiff Linda O'Sullivan respectfully requests that the Court enter a judgment in her favor and against defendant Ramapo Practice Management, LLC, for compensatory and punitive damages, including lost pay, front pay, damages for cost of continued medical coverage, damages for emotional distress, injunctive relief in the form of reinstatement, attorneys' fees, costs, and any and all other damages permitted by law, and granting such other

and further relief as the Court deems just and proper.

Dated: April 30, 2007

*/s/ Vanessa R. Elliott*

Vanessa R. Elliott, Esq. (VE 4752)
Counsel for Plaintiff
Beattie Padovano, LLC
50 Chestnut Ridge Road
Montvale, NJ 07645
(201) 799-2120 (direct)